**GOODYEAR TIRE AND RUBBER COMPANY, Petitioner,**

v.

**Hortencia PORTILLA, Respondent.**

No. D–3000.

Supreme Court of Texas.

June 22, 1994.

---

Joe R. Greenhill, Patrick O. Keel, Austin, Richard R. Brann, Reagan Burch, Houston, for petitioner.

John Griffin, Jr., Cynthia T. Sheppard, Robert P. Houston, Victoria, Christa Brown, Austin, for respondent.

GAMMAGE, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, HIGHTOWER, DOGGETT, CORNYN and SPECTOR, Justices, join.

This is an employment contract dispute in which the jury made findings that Goodyear had modified its "at-will" employment contract with Hortencia Portilla in at least two ways: Portilla could be terminated only for "good cause," and could not be discharged for violating Goodyear's anti-nepotism policy. The trial court rendered judgment on the jury verdict, and the court of appeals affirmed. 836 S.W.2d 664. We granted writ of error on the broad issue of whether oral statements assuring job security could constitute some evidence of a modification of at-will employment to a contract requiring "good-cause" for termination. After reviewing the record, we have concluded it is unnecessary to reach this broad legal issue. The jury found that Goodyear had expressly waived its right to fire Portilla under its anti-nepotism policy. This waiver constituted a specific modification of what we will otherwise assume was Portilla's at-will employment "contract."[1] The jury found that Goodyear, seventeen years later, terminated Portilla because her brother's managerial position over her violated the anti-nepotism policy. Since there is evidence to support the jury findings of this specific modification, we affirm the judgments of the courts below.

The manager for Goodyear Tire & Rubber Company's Port Lavaca store hired Hortencia Portilla in 1965. She served through a succession of store managers in the early years. Sometime during 1969 or early 1970, her brother Reynaldo "Rey" Reyes, also a Goodyear employee, was transferred from another store to the Port Lavaca location, for the specific purpose of being trained and elevated to the position of store manager. Not only did everyone at the store know Rey was Hortencia Portilla's brother, but all the first and second levels of Goodyear management also knew it. Those with knowledge included particularly the assistant district managers and district managers at that time for the whole South Texas quadrant of Goodyear's sales operations.

Goodyear had an anti-nepotism policy which did not change at any time relevant to

---

1. At will employment exists when the parties do not limit the ability of either employer or employee to terminate employment at their will. When Goodyear agreed not to fire Portilla on the basis of violation of its anti-nepotism policy, Goodyear limited its ability to terminate at its will, thus removing the employment relationship from the at will category.

the dispute. Under the policy, a store managerial employee was not supposed to oversee a family member. It is undisputed that Portilla's working directly under her brother contravened this policy.

The anti-nepotism policy was a significant part of Goodyear's employment relationships. The policy had existed since at least 1947, and Goodyear had a set procedure to enforce it. The related employee had to accept a transfer or be terminated, unless a specific exception to the anti-nepotism policy was granted by a Goodyear executive at headquarters (Akron) having personnel jurisdiction over the employee. Numerous Goodyear executives testified that granting an exception was very rare.[2]

Around or just before 1987 an audit "rediscovered" that Portilla was managed by her brother. The directive came from Goodyear executives in Akron that she had to be transferred or discharged. Portilla, then over forty years of age, could not transfer. She had documented throughout her employment with Goodyear that because of her husband's job and family commitments, she could only work in Port Lavaca. Thus in 1987, after Portilla had been employed by Goodyear for 22 years, and after she had worked in open contravention of the anti-nepotism policy for over 17 years, Goodyear discharged her for refusing to accept a transfer to cure the policy conflict.[3] Portilla had received numerous commendations for her excellent work during her employment with Goodyear. Goodyear has no complaints about her actual performance. Violation of the nepotism policy was the sole reason Goodyear discharged her. Portilla sued Goodyear for wrongful termination of her employment contract.

Every pleading by Portilla, from her Original Petition to her Fifth Amended Original Petition with Supplemental Pleading on which she went to trial, included the specific allegation that Goodyear had expressly modified its employment-at-will relationship with Portilla by waiving enforcement of the anti-nepotism policy against her. Goodyear's Sixth Amended Original Answer with supplement, on which it went to trial, recognized the allegation of express contractual waiver of the policy with numerous specific pleadings, including affirmative defenses.[4] Portilla's supplemental pleading alleged certain affirmative defenses to Goodyear's affirmative defenses, including that Goodyear was estopped to claim that Portilla had waived enforcement of her 1975 exception because for over seventeen years knowing of the violation it failed to enforce it, even if it claimed no knowledge its own expressly-authorized executive granted the 1975 exception.

Trial was to a jury, which answered broad questions for Portilla that Goodyear had agreed that it would not fire her except for

---

**2.** Goodyear's live pleadings asserted that the action against Portilla was justified because violation of its anti-nepotism policy was "good cause," even if Portilla's employment contract had been modified to require good-cause termination.

**3.** Goodyear maintained at trial that Portilla had voluntarily resigned. This issue was resolved against Goodyear and no point of error before this court preserves any complaint about that finding. For purposes of this opinion, it is established fact that Portilla was discharged for violating the anti-nepotism policy.

**4.** Goodyear's pleadings include: "that during the operative events in 1987, it had no notice, or knowledge, either actual or constructive that any of its employees had ever considered or granted Plaintiff and her brother an exception to Defendant's anti-nepotism policy"; that "No record was ever made of any such order being issued by [then Akron-office Manager of Sales Personnel] Joe Beckley, and there is no evidence of any such order being made, except through Beckley's affidavit that was prepared by Plaintiff's attorney, and is based upon his present recollection of events allegedly occurring in 1975"; that "Defendant is not prohibited from rescinding the decision by Beckley, if he did in fact grant an exception, and Defendant may subsequently enforce its anti-nepotism rule against Plaintiff and her brother"; that the "alleged statement and order is legally insufficient to create a modified employment at-will status"; that "If Beckley did authorize an exception to the anti-nepotism policy for Plaintiff, Defendant was not bound by such decision, because the act was not contractual in nature, and Defendant could reverse the decision and apply its anti-nepotism rule to Plaintiff and her brother anytime it chose"; and that Portilla was estopped from enforcing the exception order because none of Goodyear's personnel involved in the 1987 enforcement decision "had any notice, either actual or constructive that there was even a possibility that Joe Beckley might have granted an exception to Plaintiff in 1975."

good cause, and that Goodyear discharged her without good cause. These broad questions form the basis for the two points of error on which we granted writ of error. In a cluster of four far more specific jury questions, however, the jury also found (1) that Goodyear had expressly waived its anti-nepotism policy with respect to Portilla; (2) that Goodyear had discharged Portilla because she was related to Rey Reyes; (3) that Goodyear had waived its right to require Portilla to transfer for being related to Reyes; and (4) that Goodyear had discharged Portilla because she refused to transfer. Without addressing whether there was evidence of the broad "good cause" modification of the employment-at-will relationship, we focus our attention on the specific findings on the anti-nepotism policy.

■ There is evidence to support the jury findings of express waiver of the anti-nepotism policy as to Portilla.[5] A 1974 audit expressly brought the situation to Goodyear's attention. In 1975 Reyes as store manager specifically requested a waiver in his written response to the audit. A copy of Reyes' letter is in evidence. Reyes testified the conduct of district managerial personnel indicated the waiver was granted. There was testimony that the assistant district manager during the relevant time had known of the situation and specifically obtained approval of the waiver.

Also in evidence was the sworn statement[6] by the retired former Goodyear executive who would have had authority[7] to grant the written exception during his tenure at Goodyear headquarters in Akron. The sworn testimony states:

> During 1975, as part of my responsibilities, I received an audit of the Port Lavaca, Texas Goodyear Store, done by Bob Moore. The auditor had pointed out that the manager of the store was supervising his sister. Mr. Rey Reyes was the manager and Mrs. Portilla was the employee he was supervising.
>
> I learned then that Mr. Reyes had been promoted to manager by district supervisory personnel with full knowledge of his relationship with Mrs. Portilla. I also learned then that this situation had been in existence several years, and that she had been an employee at the Port Lavaca store for ten years.
>
> After considering the circumstances, I issued a letter to district supervisory personnel. Because she had been an employee for many years, and because the situation had gone on for several years with the knowledge of Goodyear's supervisory personnel, I decided that we should offer her a transfer, and if she was not able to transfer, that she would remain in her present position as an exception to the policy. This was a single, isolated, ap-

<hr/>

**5.** The dissenting opinion states the waiver was invalid as a contractual modification because there was no evidence it was communicated to Portilla and she relied on it. Goodyear's application presented only the two points on which we granted writ. Goodyear, the losing party in both lower courts, appears to have waived other complaints on the alternative ground of waiver raised before the court of appeals but not here. *McKelvey v. Barber*, 381 S.W.2d 59, 64 (Tex.1964). Even assuming the error was preserved, the dissent's assertion is legally incorrect. When the contractual provision in question runs in favor of one party, that party may unilaterally waive it, making the waiver an enforceable right against the party making it, without additional consideration, meeting of the minds, or even communication to the other party. *Equitable Life Assur. Soc. v. Ellis*, 105 Tex. 526, 538–39, 147 S.W. 1152, 1157 (1912). There was clear evidence Goodyear intended the waiver to operate for so long as Portilla was continuously employed. Further, if we were to reach the question of

evidence of agreement, there was evidence that Goodyear routinely communicated such exceptions to the employee affected. Although Portilla at one point testified Goodyear never communicated the decision to her, at another point she testified she could not remember whether Goodyear told her. There was evidence she and her brother assumed the exception had been granted and relied on it. This constitutes some evidence under our standards for no evidence review. *Garza v. Alviar*, 395 S.W.2d 821, 824 (Tex.1965).

**6.** The affidavit is in evidence as a written document. The witness held the title of Manager of Sales Personnel at Goodyear in Akron. No preserved point of error attacks the admissibility of this evidence.

**7.** Supported by some testimony from Goodyear's own current executives, he had the authority at the relevant time.

proved exception which was not to be construed as a change in the Goodyear policy.

This letter should be in Goodyear's files, unless it has been destroyed or lost.

A current Goodyear executive testified that he could not determine whether the written exception had issued, because under Goodyear's document retention policies it would have been destroyed because it was so old.

The retired executive testified that the granting of the exception was intended to be communicated down the chain of command to the store level. He further testified to the contractual nature and intention by Goodyear in granting it:

Q. You told me on the tape, and I believe we still established today, you had the authority to grant the exception?

A. The delegated authority, yes.

Q. Right. Have you ever seen in the company policies or has anyone at Goodyear ever told you that anyone at Goodyear would have the right to come in behind you after you had made the decision on the exception and change their mind?

A. No.

Q. All right. And your intent at the time would have been to allow her to continue working for her brother as long as she did her job and her job was open?

A. That would have been my intent had I made that decision, yes.

    \*    \*    \*    \*    \*    \*

Q. But it was your word, wasn't it, it wasn't just Goodyear's. It was Joe Beckley who made that decision?

A. Joe Beckley made a decision, yes, but it wasn't my word.

Q. Why not?

A. I merely made a call, that's all. That wasn't Joe Beckley promising anything. What I did—what I would have done, I would have done in the name of the Goodyear Tire & Rubber Company.

    \*    \*    \*    \*    \*    \*

Q. And do you remember at the conclusion of the affidavit, at the end of the time we were visiting on the phone and after we'd cleared up the affidavit when you told me, "That's exactly what happened"?

A. If it's on the tape, that exactly what I said.

Q. Okay. No one has ever told you that anyone overruled your decision, have they?

A. No.

There is evidence to support the jury findings on the express waiver of the anti-nepotism policy. At trial and on appeal, Goodyear maintained that the nepotism issues were immaterial. Goodyear apparently contends, as do several *amici* on its behalf, that unless there is a broad agreement to abandon the at-will employment relationship, the parties cannot agree to a specific exception to it. The amici thus argue that an employer always has the right to change its mind on enforcement of policies against an employee, even if it has a specific agreement with the employee to disregard the policy.

■ Such contentions misstate Texas law. The employment-at-will doctrine has always been subject to specific contractual agreement defining an exception. The at-will doctrine only applies *absent* a specific contractual provision to the contrary. *East Line & R.R. Co. v. Scott,* 72 Tex. 70, 78, 10 S.W. 99, 104 (1888); *Maus v. National Living Centers, Inc.,* 633 S.W.2d 674, 675 (Tex. App.—Austin 1982, writ ref'd n.r.e.).

■ The Texas case closest in point is probably *Morgan v. Jack Brown Cleaners, Inc.,* 764 S.W.2d 825 (Tex.App.—Austin 1989, writ denied). In *Morgan,* the trial court granted summary judgment to the employer Jack Brown Cleaners under the employment-at-will doctrine. Jack Brown had employed Morgan in connection with its prewash process for Levi Strauss, for which Morgan previously worked. When the prewash operation ceased, Jack Brown terminated Morgan. There was summary judgment evidence[8]

8. Goodyear contended in the courts below that any modification of the employment-at-will status had to be in writing. There is ample evidence that Goodyear granted the waiver of the anti-nepotism policy to Portilla in writing, but copies of the documents were destroyed over

that Jack Brown had specifically agreed with Morgan that if the prewash operation shut down, it would find another position for him within Jack Brown Cleaners. In other words, there was evidence of an express agreement that Jack Brown would not fire Morgan because the prewash operation ceased. The court of appeals reversed the employer's summary judgment because the evidence raised a fact issue that Jack Brown had agreed not to discharge the employee "solely because a particular event [prewash closing] occurred," although the contractual agreement was for "other than an exact duration of the contract." 764 S.W.2d at 827. *See also Johnson v. Ford Motor Co.*, 690 S.W.2d 90, 93 (Tex.App.—Eastland 1985, writ ref'd n.r.e.) (contractual modification of "specific contract term" not specifying duration of employment may set conditions that modify at-will status according to terms of specific provision). Although it is after full trial on the merits, we have a similar situation here. Assuming Portilla's employment contract was otherwise at-will, Goodyear fired her for the only reason for which it expressly contracted not to fire her.

We neither approve nor disapprove any language by the court of appeals below. Because of the jury findings Goodyear specifically waived the right to enforce its anti-nepotism policy against Portilla and then fired her for that very reason, we affirm the judgments of the court of appeals and trial court.

ENOCH, J., not sitting.

HECHT, Justice, dissenting.

In this case, an employer allowed an at-will employee to continue working under her brother's supervision, even though it violated the company's anti-nepotism policy. When the employer finally insisted on compliance, the employee refused, sued the employer for breach of contract, and recovered over $600,-000 in damages. The Court affirms this result.

The Court holds that an employer's failure to enforce an employment policy constitutes a contract with its otherwise at-will employees not to terminate them for failure to comply with the policy. An employer who has no policies at all may terminate an at-will employee without warning for any reason not prohibited by law, or for no reason at all. *Winters v. Houston Chronicle Publishing Co.*, 795 S.W.2d 723, 723–724 (Tex.1990). An employer may adopt and enforce totally new policies, if it notifies its employees; an employee who continues working with knowledge of the changes is deemed to have accepted those changes as a matter of law. *Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 229 (Tex.1986) (change in commissions was not accepted). But an employer who has policies which are not strictly enforced has, according to the Court, contracted not to discharge an employee for any reason that would constitute a policy violation. Latitude, forgiveness and oversight impose obligations and the risk of liability on the employer; rigid enforcement does not. Thus, from an employer's perspective, it is better to have no policies at all, essential to strictly apply any that are adopted, and unadvisable to be flexible in the least.

The Court cannot, of course, find a single case which reaches this result in anything like the present circumstances. The reason for this, it seems to me, is that the Court's view is exactly opposite what the law should be. It is clearly better for an employer to have policies rather than not, since the employees thereby have more information about what is expected of them. And it is surely better to exercise some latitude in enforcing those policies rather than always requiring strict adherence. Under these rules, Goodyear would not be liable in this case. Accordingly, I dissent.

Hortencia Portilla worked as an at-will employee in a Goodyear Tire and Rubber Company store in Port Lavaca under the direct supervision of her brother Reynaldo Reyes for 17 years, contrary to Goodyear's anti-nepotism policy. In such circumstances the

time. We express no opinion on whether oral modification is sufficient. Our citation to cases holding oral modifications sufficient should only

be taken as approval of their holdings and language that specific modification is allowed, without reaching the "oral or written" issue.

policy required that one of the two employees transfer to another store or be terminated unless granted an exception from the policy. Corporate management knew of Portilla's situation for at least 12 years but took no action. (One corporate official recalled advising a local district manager to offer Portilla a transfer but, if she refused, to allow her to remain in her position, but that decision was never communicated to Portilla or her brother Reyes.) Finally, Goodyear insisted that Portilla either transfer to Houston or leave its employ. Portilla refused the offer of transfer because of her husband's job and their family commitments in Port Lavaca, and her employment was terminated. A week later her brother terminated his employment with Goodyear.

The trial court rendered judgment against Goodyear for breach of contract, awarding Portilla $396,000.00 in actual damages, $58,-376.86 in prejudgment interest, and $181,-512.88 in attorney fees, altogether totaling $635,889.74. The court of appeals affirmed this award, holding that there was evidence that Goodyear gave Portilla assurances of continued employment which amounted to an agreement not to terminate her except for good cause, so that she was no longer an at-will employee. 836 S.W.2d 664. In this Court, the parties vigorously contest the effect of Goodyear's statements to Portilla, and we granted writ of error to resolve this dispute. 36 Tex.Sup.Ct.J. 489 (Jan. 27, 1993). The Court now attempts to avoid the parties' arguments by devising another theory to allow recovery. The Court seizes on jury findings that Goodyear waived its anti-nepotism policy and its right to insist that she transfer to another store, and that it discharged her because of her relationship to Reyes and her refusal to transfer. By waiving its anti-nepotism policy, the Court says, Goodyear affirmatively agreed not to discharge Portilla for a violation of the policy. In effect, the Court reasons, the jury found that Goodyear breached that agreement.

The first difficulty with the Court's analysis is that Goodyear's nonenforcement of its policy, even if it amounted to a waiver of some sort, cannot be converted into an agreement with Portilla. Goodyear never offered to Portilla that it would not enforce the anti-nepotism policy against her. Without an offer and acceptance, there could be no agreement, and without an agreement, there can be no recovery of damages for breach of an agreement. Portilla was awarded damages for breach of contract. Goodyear's failure to enforce its own policy cannot be construed as a contract with Portilla.

Furthermore, the Court does not explain how it is that Goodyear's nonenforcement of its anti-nepotism policy in the past—waiver, if that is what it is to be called—constituted an agreement that Goodyear would not enforce the policy in the future? Even if Goodyear could not require Portilla to transfer based upon her past violation of the policy, surely Goodyear could insist at some point that the policy be adhered to in the future. I am not aware of any situation in which a waiver of a right constitutes an agreement, in perpetuity, never to demand the right again in any circumstances. The rule is to the contrary. For example, a person's acceptance of late payments without protest precludes a complaint that the debt agreement has been breached, but it does not preclude insistence upon timely payments in the future. *A.L. Carter Lumber Co. v. Saide,* 140 Tex. 523, 168 S.W.2d 629, 630 (1943). The acceptance of late payments never constitutes an agreement to continue doing so which is then breached by the creditor's insistence on future promptness. It would be a perverse rule indeed that would entitle a debtor who had been extended some latitude in his payments to sue his creditor for breach of contract when the creditor lost patience and demanded timeliness in the future. That, however, is the nature of the rule the Court adopts in this case.

The only authority the Court cites supports the undisputed proposition that an employer may agree with an at-will employee not to discharge him except under specified circumstances. The possibility of such agreements says nothing about the effect of nonenforcement of a policy. The point is not that Goodyear could have agreed with Portilla that it would not dismiss her except for specific reasons; the point is that no such agreement was ever made.

The Court is determined to avoid the principal issue in this case. The essence of Portilla's claim is that Goodyear terminated her employment despite its management's assurances that it would not do so as long as she did a good job. The issue addressed by the court of appeals, argued by the parties and amicus curiae, and squarely presented for decision, is whether such assurances modified her at-will status. I would hold that they did not, and accordingly, that Portilla is not entitled to recover against Goodyear. I therefore dissent.